IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  Case No. 12 - CR - 291 (TJM)

UNITED STATES OF AMERICA

GOVERNMENT'S SENTENCING
MEMORANDUM

v.

DAVID MONELL,
       Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its sentencing memorandum requesting that the defendant be sentenced to a term of incarceration consistent with the United States Sentencing Guidelines applicable to his conduct.

# I

# INTRODUCTION

On August 10, 2012, the defendant entered a guilty plea to 1 count of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242. The defendant is scheduled to be sentenced on December 18, 2012 at 9:30 a.m.

# II

# APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

1. **Statutory Maximum Sentence**

The defendant's conviction for deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242 subjects the defendant to a statutory maximum term of ten (10) years imprisonment; a three (3) year maximum term of supervised release, *see* 18 U.S.C. § 3583; and a fine of $250,000 *See* 18 U.S.C. § 3571.

2. **Guidelines Provisions**

   a. **Offense Level**

   Paragraphs 16 through 21 of the Presentence Investigation Report ("PSIR") provide as follows: The base offense applicable to the defendant's conviction for deprivation of civil rights under U.S.S.G. § 2H1.1(a)(3) is **10**, as the offense involved the use or threatened use of force; there is an increase of **6** levels under U.S.S.G. § 2H1.1(b)(1) because the offense was committed under color of law; and, there is a **2** level upward adjustment under U.S.S.G. § 3A1.3 because the victim was restrained during the offense of conviction.

   b. **Acceptance of Responsibility**

   The defendant is entitled to a **2** level downward adjustment to his offense level for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a). The government moves for an additional **1** level downward adjustment pursuant to U.S.S.G. § 3E1.1(b) to credit the defendant for having "assisted authorities in the investigation and/or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."

c.  **Criminal History Category**

According to paragraph 27 of the PSIR, the defendant's criminal history category is I. The government agrees with the Probation Office's determination of the defendant's criminal history category.

d.  **Guidelines Range and Sentence**

As described above, the combined offense level is **15** and the criminal history category is **I**. This is consistent with the calculations in the presentence report.

As a result of the above-described calculations, the federal sentencing guidelines sections advise that the defendant should receive a sentence of **18 to 24** months imprisonment; a supervised release term of not more than **3** years; and a fine of **$4,000** to **$40,000**. PSIR ¶¶ 46, 49, 54.

## III

## GOVERNMENT'S SENTENCING RECOMMENDATION

The government is incorporating into this sentencing memorandum videotapes obtained from the Tioga County Jail that recorded the entire incident. Also included for the Court's review, are videotaped interviews of David Coffey, the inmate subjected to the assault by the defendant.[1] The defendant's counsel represented to the Court at the time of the plea that, although not rising to the level of legal justification for what defendant did, the defense would argue to the Court at sentencing that defendant's conduct was a reaction to inmate Coffey spitting in defendant's face.

---

[1] Copies of grand jury exhibits 1-5 are incorporated into this sentencing memorandum and are available for the Court's review at any time. Defense counsel was provided with copies as part of the discovery in this case. The exhibits are compact discs containing video from two different camera angles in the intake area of the jail on the day of the incident, cropped closer views of the incident from one of those cameras, videotaped interviews of inmate Coffey on June 21, 2010 and June 22, 2010, and photographs of injuries received by inmate Coffey. The U.S. Attorney's Office will maintain custody of these exhibits until such time as this Court, or any Court reviewing these proceedings, requests to view them.

The government has reviewed the videotaped evidence scores of times, and there is no indication on the videotape that inmate Coffey spit at defendant prior to defendant's initial barrage of punches being launched at Coffey. Inmate Coffey denies that he spit in the defendant's face prior to being punched by defendant.

A review of inmate Coffey's videotaped statements shows that, according to Coffey, when defendant came over to him and started talking about obeying the rules and that there would be consequences to not obeying the rules (such as being pepper-sprayed), Coffey told the defendant, in effect, " I don't give a fuck about you or your jail." (see, PSIR ¶ 7)

During the government's investigation, information was obtained from correctional officers indicating that the defendant "ruled the jail by intimidation." Just prior to the assault on inmate Coffey the defendant told the correctional officers in the intake area to "take a walk." The defendant waited until they all left the room before approaching inmate Coffey, possibly as a means of psychologically "intimidating" Coffey. When the defendant started "lecturing" inmate Coffey about his conduct in the jail, Coffey, in effect, told defendant to "fuck-off." The defendant's reaction to this challenge to his authority was to attack inmate Coffey in the manner observed on the videotape. Inmate Coffey was punched in the face and head area at least 5-6 times before the defendant grabbed Coffey by his face and neck and raised him up from the bench in a choking motion. It appears that the defendant's violent actions directed against Coffey were undertaken in an effort to "regain the upperhand," so to speak, by cowing inmate Coffey into "submission."

To the extent that the defendant attempts to persuade the Court at sentencing that he "snapped," or momentarily "lost control" *as a result of* inmate Coffey spitting in his face, the evidence does not support such a claim. The evidence clearly establishes that defendant directed

eight or nine correctional officers to "take a walk" and waited until they all left the room before approaching Coffey. One can clearly infer from this action that the defendant wanted to be left alone with Coffey. We know that he was not directly involved in the incident with Coffey the prior evening, or in the incident moments earlier when Coffey was pepper-sprayed and then removed from the cell in the intake area and handcuffed to a bench in the intake area. Therefore, this was not a situation where defendant was involved in a violent interaction with an inmate and used excessive force "in the heat of the moment." Based on all the evidence, it appears that defendant cleared everyone out of the room for a reason before approaching Coffey, that he was angered by Coffey's refusal to submit to him in a deferential manner, and that defendant physically attacked Coffey in an effort to impose his will on him.

Inmate Coffey suffered swelling, contusions, pain and discomfort for a significant period of time after the incident, and had problems seeing out of his left eye for approximately nine months as a result of defendant's actions.

Immediately after the incident, defendant went to the Captain's office, and told him what he had done, in substance, that he had lost his temper and "tuned up" an inmate. (see, PSIR ¶ 9) He resigned two days later when presented with the choice of resignation or being brought up on departmental charges.

The defendant, while employed as the Correctional Lieutenant and Jail Administrator for the Tioga County Jail, engaged in an unjustified assault on an individual who was in the custody and control of the correctional facility, at a time and under circumstances that the restrained inmate posed no threat to the defendant or anyone else.

Based on all of the information before the Court, the government respectfully submits that a sentence of incarceration consistent with the applicable guidelines range as determined in the PSIR is appropriate in this case. The sentence recommended by the government here is sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2) for the following reasons:

A sentence of incarceration consistent with the applicable sentencing guidelines would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant's conduct. 18 U.S.C. § 3553(a)(2)(A). Law enforcement personnel, including correctional officers, face many difficult situations, but they are entrusted with maintaining the safety and well-being of those committed to their custody. By violating this trust, particularly with regard to a restrained and vulnerable individual, the defendant committed a serious offense. An aggravating factor here is that the defendant was the Correctional Lieutenant, who also served as the Jail Administrator, meaning that he was in charge of supervising the jail operation. Correctional officers under his command would naturally look to him for leadership and to set the tone in terms of resolving issues with inmates. Unfortunately, the defendant's method of ruling by "intimidation," which in this case spilled over into violence, clearly set the "wrong tone" and is not the type of "example" that society is desirous of having correctional officers emulate. The Court, by the sentence it imposes, should send a clear message to correctional officers that serious consequences await those who engage in such conduct.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see, e.g., Gall v. United States*, 552 U.S. 38, 46 (2007)

(Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Moreover, within-guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).[2]

Respectfully submitted this 28th day of November, 2012,

RICHARD S. HARTUNIAN
United States Attorney

By: /s/ K. P. Dooley
Assistant United States Attorney
Bar Roll No. 302263

---

[2] The government reserves the right to respond to defense arguments raised for the first time after filing of this memorandum. Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.